WILLIAM J. TERRY & another vs. RIVERSIDE TRANSPORTA-
TION CO.

Suffolk.    December 6, 1954. — March 29, 1955.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & WILLIAMS, JJ.

Carrier, Contract carrier, Common carrier.  Negligence, Heavy object,
    Carrier.  Proximate Cause.

At the trial of an action by a consignee against a transportation company
    for an alleged breach of a contract to deliver a lathe in an undamaged
    condition, it was error for the trial judge to rule that the defendant
    was liable as a common carrier under the provisions of U. S. C. (1952
    ed.) Title 49, § 20 (11), where the evidence showed merely that
    by special agreement the defendant transported the lathe by trailer
    truck from Massachusetts to Vermont under a uniform motor carrier
    straight bill of lading for an agreed price and did not show that the
    defendant acted as other than a private or contract carrier liable only
    for damage to the lathe caused by its negligence.  [408]
A finding that a contract carrier was negligent in using skids of an in-
    adequate size under and bolted to a long and heavy lathe as a support
    while transporting the lathe by trailer truck a distance of one hundred
    seventy-five miles was not warranted, even if nuts and bolts coupling
    one section of the lathe to the other section loosened in transit and
    thereby weakened the structure of the lathe so that it later cracked
    while the consignee was unloading it from the truck, where the evi-
    dence left it conjectural whether such loosening was due to inadequacy
    of the skids or merely to normal vibration in transit.  [409]

CONTRACT OR TORT.    Writ in the Municipal Court of the
City of Boston dated July 16, 1953.

In count 3 of the declaration the plaintiff Williams Ma-
chine Company, Inc., alleged in substance that the defen-
dant delivered a lathe to the plaintiff "in a damaged con-
dition, said lathe having been in a good and undamaged
condition when delivered to the defendant carrier, where-
fore the plaintiff . . . says that the defendant has breached
its contract to deliver the said lathe in the same condition
as received, thereby causing the plaintiff . . . serious and
substantial loss."

The action was heard by *Tomasello*, J.

*Timothy H. Donohue*, (*Jeffrey O'Connell* with him,) for the plaintiff Williams Machine Company, Inc.

*Frank P. Hurley*, for the defendant.

WILLIAMS, J. This is an action of contract or tort by William J. Terry and Williams Machine Company, Inc., who seek separately to recover for damage to a lathe received while being transported by the defendant from Boston to Poultney, Vermont. The declaration is in four counts. In count 1 Terry, who was the consignor of the lathe, alleges breach of contract and in count 2 negligence. In count 3 Williams Machine Company, Inc., which was the consignee of the lathe, also alleges breach of contract and in count 4 negligence. There were findings for the defendant on counts 1 and 2, and for the plaintiff Williams Machine Company, Inc., on count 3 in the amount of $2,650. The Appellate Division ordered that the finding on count 3 be vacated and that judgment be entered for the defendant. Williams Machine Company, Inc., hereinafter referred to as the plaintiff, appealed.

There was evidence as follows. Terry, who was in the business of buying and selling new and used machinery, sold an American gearhead lathe to the plaintiff for the sum of $6,500. Terry, after consulting with the general manager of the plaintiff, arranged with the defendant to transport the lathe by truck from East Boston to the purchaser's plant at Poultney, Vermont, a distance of about one hundred seventy-five miles. It was arranged by Terry with the defendant that the plaintiff would assume the responsibility of unloading the machine when it arrived. The lathe was about forty-four feet long and weighed between twelve and seventeen tons. It consisted of a headstock, about thirty-two feet in length; a tailstock, twelve feet in length; a bed, which was the main casting of the whole body of the machine; and legs. The section containing the headstock was coupled to the section containing the tailstock by four bolts on the ends of which were nuts. The nuts were tight at the time of shipment. The lathe was

shipped under a uniform motor carrier straight bill of lading by a trailer truck for an agreed price. The trailer was thirty-two feet long and had a capacity of twenty tons. Preparatory to shipment the defendant inserted timbers, six inches wide and eight inches high, called skids, lengthwise under the machine and bolted them to it. Terry inspected the skids and told the treasurer of the defendant that the skids were not heavy enough and should be ten inches by ten inches. The treasurer replied that the skids were heavy enough and on Terry saying, "Well, I don't like it, at least put a timber or something to support it," said, "I'll take care of it." From a photograph which was in evidence it appears that the legs of the lathe rested upon the skids and that there was a space of more than the width of the skids between them and the bed of the lathe. After loading, the tailstock section of the lathe extended about twelve feet beyond the rear end of the trailer. To furnish a "strong back" over the coupling a crib of six by six and six by eight inch timbers was built over the machine and the whole chained down to the trailer. The lathe arrived at Poultney apparently without incident on the road and was accepted by the treasurer of the plaintiff who receipted for it on the bill of lading and paid the transportation charges. The driver of the truck paid no further attention to the lathe and left it on the trailer in the custody of the plaintiff's employees. One of these employees, one Barrington, who was experienced as a rigger and mover of heavy machinery, examined the lathe and took sole charge of its unloading. A ramp, forty-five to forty-eight feet in length, made of cribbing and timbers, was built from the floor of the plaintiff's machine shop to the end of the trailer platform, which was approximately four feet from the ground. Timbers were placed crosswise between the machine and the skids, and jacks applied under these timbers, the jacking process beginning with the part of the machine nearest to the end of the trailer. As the machine was lifted by the jacks six inch rollers were placed under it. The plaintiff's employees then pulled the lathe from the trailer and down

the ramp by means of a cable connected with the engine of another truck. The tailstock went first. When all but eight feet of the headstock was off of the ramp, there was a loud noise and the lathe sagged over a space of about thirty-four feet. At that time the middle section of the machine was suspended between the end of the headstock which was on the ramp and the end of the tailstock which was on the floor of the machine shop. Following the noise, a vertical crack was noticed by Barrington on the side of the lathe twelve or thirteen inches on the tailstock side of the coupling where the bolts were located. Several of the rollers were taken from under the machine, thereby eliminating some of the sag, and the lathe was rolled down to the floor of the shop. Next day it was found that three of the four nuts on the two bolts on the side of the lathe where the crack occurred were loose. Barrington, who was called by the plaintiff to testify as to the cause of the cracking, testified that when he first observed the sagging of the bed of the lathe he did not observe any sagging of the skids; that there was an open space underneath the lathe, in other words there was no support underneath the lathe at the point of the sag; "that if ten by ten inch skids were used on the lathe there wouldn't have been so much sag and that if it was a job that he had to do he would have had a heavier skid under the lathe, either ten by ten inch or ten by twelve inch. 'Your ten by ten inch wouldn't be very much stronger or much more support to the machine'; that assuming that the nuts on the bolts connecting the two sections of the lathe were tight when it left East Boston and that they were loose on arrival at Poultney, Vermont, 'evidently they must have become loose on the way up with working back and forth of that tail end hanging over. That's the only way I can account for it'; that his opinion of what caused the crack would be that two of the nuts on the inside and one nut on the outside of the bed were loose, and the other nut, the upper one, on the outside of the bed, was tight, there was a strain of the whole machine, when suspended, on the one tight nut, 'the weakness happened to be on that one

side, so that's why it cracked, it had no support from the other side at all, the one side sustained the load, if the nuts had been tight you'd have both sides for strength' . . . that if he knew when the lathe arrived at Vermont that the bolts or nuts joining the two sections of it together were loose he would have tightened the nuts before he touched the machine; that those bolts and nuts were in a position where an inspection by him or his fellow workers would have disclosed whether they were loose or not; that the reason why the crack occurred where it did rather than at the junction of the two sections of the lathe was in his opinion due to the fact that the casting there was weaker, by reason of a bolt coming up through the middle at the spot where the crack occurred, 'if it hadn't been weaker it would have broken where the bolts went through'; that he couldn't give any answer as to why the casting was weaker at the point of the crack than at the junction of the two sections of the lathe; that if the bolts and nuts had been tight there wouldn't have been any sagging of the lathe; that when one end of the lathe was on the floor of the machine shop and the headstock was still on the ramp, with a suspension of the lathe extending over more than thirty feet, he would not have expected the skids to give under the weight of the machine, 'you would depend more on the bed itself to sustain the weight than you would on the skids at that particular point'; that he did depend on the strength of the machine rather than on the skids to withstand the suspension that he anticipated; that the skids wouldn't give unless the machine gave; that some of the nuts were so loose that they could be turned by hand, some could be tightened by one turn, the others needed two turns; that two turns would move the nut on the bolt about one quarter inch."

At the conclusion of the evidence the judge ruled, at the request of the plaintiff, that "The defendant is liable to the plaintiff . . . under the provisions of Title 49 of the United States Code Annotated, Section 20 (11)," and that "There is evidence that warrants the court in finding that the defendant did not deliver the American gearhead lathe

in as good condition as it was when it was received from the shipper." He found that "on the facts . . . improper skidding of lathe by defendant caused lathe to crack while in process of unloading." He denied the defendant's requests to rule that the evidence did not warrant a finding of negligence on the part of the defendant and that "as a matter of law, the only rational explanation of the damage . . . is that . . . [it] resulted from a lack of due care on the part of the plaintiff . . . its agents or servants."

The plaintiff offered no evidence that the agreement with the defendant was for the transportation of the lathe by the defendant as a common carrier. So far as appears the defendant acted as a private or contract carrier under a special agreement arranged by Terry. As such it was liable to the plaintiff only for damage caused to the lathe by its negligence. *Houle* v. *Lewonis*, 245 Mass. 254, 255. The judge was in error in ruling that the defendant was liable to the plaintiff under the provisions of U. S. C. (1952 ed.) Title 49, § 20 (11), as that statute applies only to transactions where the carrier acts as a common carrier. In view of this ruling, the judge may have found for the plaintiff on the ground that the defendant was liable irrespective of its negligence, in which case his finding for the plaintiff cannot stand. As, however, he denied the defendant's request for a ruling that the evidence did not warrant a finding of its negligence, we proceed to consider the correctness of that ruling.

There was a finding of fact that improper "skidding" by the defendant caused the lathe to crack in the process of unloading. The negligence if any of the defendant therefore consisted in the use of improper skids. The finding does not specify whether the skids caused the lathe to sag in the process of unloading and as a consequence to crack, or whether they caused the nuts to loosen in transit and thereby to weaken the structure of the lathe so that it later cracked in the unloading. If the use of the skids in the unloading was the cause of the crack the defendant would not be liable. The plaintiff assumed entire responsibility for the safe unloading of the lathe and cannot recover from the defendant

for damage resulting from its own acts.   The skids were provided only for the carriage of the lathe, and if the plaintiff saw fit to use them for its own purposes after the carriage was completed it has only itself to blame.

Whether the evidence warranted a finding that the defendant was negligent in using six inch by eight inch skids in transporting the lathe is a question of more difficulty. We think that it could be found that the bolts were loosened in the course of transportation.   Continual vibration over a highway route of one hundred seventy-five miles might well result in such loosening.   The important question is whether the six by eight inch skids were the cause of this loosening or to put it differently whether the suggested use of ten by ten inch or ten by twelve inch skids would have prevented such loosening.   Barrington testified that if it was "a job that he had to do he would have had a heavier skid under the lathe, either ten by ten inch or ten by twelve inch. Your ten by ten inch wouldn't be very much stronger or much more support to the machine." He apparently was then referring to the effect of the skids on the sag of the lathe when it was being unloaded.   He gave no testimony as to what size of skids would be proper for use over the road.   There was no evidence that the truck was inadequate as to size or that the skids and crib did not furnish sufficient support for the lathe during its carriage.   Nothing on it broke during the transportation.   All that occurred was the loosening of three nuts which might well be expected in the course of a long trip.   In our opinion it could not be found other than by conjecture that such loosening was caused by the skids.   See *Gates* v. *Boston & Maine Railroad,* 255 Mass. 297, 301–302.   The defendant was bound by its contract to employ ordinary care and skill in transporting the lathe.   In the absence of evidence as to what, in the nature of support, was proper and adequate in the circumstances, we think that it could not be found that the defendant was negligent.

*Order of Appellate Division*
*affirmed.*